LANE v. BROOKLYN HEIGHTS R. CO.

(Supreme Court, Appellate Division, Second Department. June 19, 1903.)

1. STREET RAILROADS—INJURIES—CROSSING TRACKS—EVIDENCE—QUESTION FOR JURY.

In an action for injuries caused by collision with a street car, *held*, that whether deceased was guilty of contributory negligence in attempting to cross the track, under the circumstances, was for the jury.

2. SAME—FAILURE TO LOOK.

In an action for death of the driver of a vehicle while crossing a street car track, plaintiff's failure to prove that the driver looked in the direction of the car by which he was struck before he attempted to cross the track was immaterial, where the car was approaching at such a distance as to warrant the assumption of safety.

3. NEW TRIAL—NEWLY DISCOVERED EVIDENCE—DILIGENCE.

Where defendant knew the name and address of a witness long before the trial, but answered, and elected to go to trial without her evidence, and her affidavit in support of a new trial for her alleged newly discovered evidence did not assert that she would testify on a new trial, and defendant did not assert that it intended to call her as a witness on such new trial, the application was properly denied.

4. SAME—MATERIALITY OF EVIDENCE.

Where, in an action against a street car company for killing deceased as he was driving across the tracks in company with a woman, all of the evidence showed that deceased, and not the woman, was driving, and that the horse was driven at a steady gait, and there was nothing to indicate that the accident occurred because of incompetent driving, an affidavit of the woman, in support of a motion for a new trial for newly discovered evidence, that she was driving, and that deceased knew she could not drive, and that they were laughing and talking,

neither of them thinking about the street car tracks, and that, just before the car struck the wagon, deceased seized the reins, but too late, was not of sufficient importance to justify a new trial.

5. WRONGFUL DEATH—DAMAGES—EXCESSIVENESS.

Deceased, who had a life position as battalion chief in a fire department, at a salary of $3,300 a year, was killed in a collision with a street car at a crossing. He was 38 years of age, and his income was the sole support of his wife and two children, aged 8 and 12 years, respectively. *Held*, that a verdict in favor of plaintiff for $25,000 is not excessive.

Woodward and Goodrich, JJ., dissenting.

Appeal from Special Term, Kings County.

Action by Sarah Irene Lane, as administratrix of the estate of Charles W. D. Lane, deceased, against the Brooklyn Heights Railroad Company. From a judgment in favor of plaintiff, and from an order denying defendant's motion for a new trial on the minutes, and from a subsequent order denying defendant's motion for a new trial for newly discovered evidence, defendant appeals. Affirmed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HIRSCHBERG, JJ.

I. R. Oeland, for appellant.
James C. Cropsey, for respondent.

HIRSCHBERG, J. The appeals are presented in two records, but the questions involved may conveniently be considered in one opinion. There is an appeal from a judgment which the plaintiff has recovered for the negligent killing of her intestate, which appeal embraces incidentally an order denying the defendant's motion for a new trial made upon the minutes; and there is a separate appeal from an order subsequently made at Special Term by the justice who presided at the trial, denying the defendant's motion for a new trial on the ground of alleged newly discovered evidence. Only one exception was taken at the trial, viz., to a refusal to dismiss the complaint at the close of all the evidence, so that upon the main case the only question for review is whether the facts required a submission of the controversy to the jury.

The accident occurred on the stretch of track coming from Jamaica to East New York through Fulton street, where the railroad passes Hoffman Boulevard. The tracks run practically east and west at this point, but Hoffman Boulevard approaches Fulton street from the southeast at an angle which would enable a driver looking ahead to nearly face a car coming from Jamaica. The boulevard does not cross the tracks, but another street, known as "Rose Avenue," commences about 30 feet north of the tracks, on the opposite side, making practically a continuous street from either direction. The deceased was driving upon Hoffman Boulevard, in company with a woman, on a clear, bright day, at half past 3 in the afternoon of August 16, 1900, and had succeeded in crossing the east-bound track with all but the middle or hind part of his wagon, when he was struck and killed by one of the defendant's cars coming from Jamaica. The cause of action was clearly established. When the deceased was within 20 feet of the track the car was between 200 and 250 feet distant, and was from 70 to 75 feet distant when the horse was on the track. It was at this

time that the motorman first attempted to control the car, but its speed was too great to enable him to avoid the collision.   Most of the witnesses testified that the car was going at the rate of 20 miles an hour, while the horse was merely jogging along.   Even the motorman testified:

"I had on full power, and my car was going as fast as it could go.  It was not going down hill much; just a trifle; that is all. * * * I never saw a trolley car go faster in my life than this trolley car of mine went that day.  I never traveled faster."

In view of the excessive speed, and the consequent distance which the car must have been from the crossing at the time when the motorman, in the exercise of ordinary care, should have seen the deceased as he was jogging across in plain sight, the jury might very well conclude that a prudent driver would assume that some timely attempt would be made at slackening the speed of the car, and that it was therefore safe to cross at the time the attempt was made.   The case, as adopted by the jury, in its salient feature, is that of a car approaching a place where it is customary for people to drive across the tracks, but approaching at the rate of 20 miles an hour, with a driver traveling at an ordinary gait, who has some right to assume that the speed will be reduced and the car placed under control before it reaches his street, but who is killed because no attempt is made to slow down until a collision is inevitable.   The authorities are numerous to the effect that such a case is one for the determination of a jury.   As Mr. Justice Woodward said in Sesselmann v. Metropolitan Street R. Co., 76 App. Div. 336, 338; 78 N. Y. Supp. 482, 483:

"It is not enough that the speed shall be reduced, if that reduction of speed does not operate to give the motorman that control of his car which is necessary to the equal rights of pedestrians and others at street intersections, and it is always a question for the jury whether the car is in such control."

There is some evidence, it is true, that the deceased drove upon the tracks without apparently looking either to the right or left. Aside from the nature of the locality, which would indicate that it was unnecessary to turn to the left in order to see the car in question, it has often been held that the failure to prove that a driver or pedestrian did look is immaterial, where the street car is at such a distance as to warrant the assumption of safety.   Brozek v. Steinway Railway Co., 10 App. Div. 360, 41 N. Y. Supp. 1017; Kitay v. Brooklyn, Q. C. & S. R. Co., 23 App. Div. 228, 48 N. Y. Supp. 982; Read v. Brooklyn Heights R. Co., 32 App. Div. 503, 53 N. Y. Supp. 209; Dunican v. Union Railway Co., 39 App. Div. 497, 57 N. Y. Supp. 326. To the same effect, in principle, are the cases of Lawson v. Metropolitan Street R. Co., 40 App. Div. 307, 57 N. Y. Supp. 997, affirmed in 166 N. Y. 589, 59 N. E. 1124; Mowbray v. Brooklyn Heights R. Co., 59 App. Div. 239, 69 N. Y. Supp. 435; Bruss v. Metropolitan Street R. Co., 66 App. Div. 554, 73 N. Y. Supp. 256; Andres v. Brooklyn Heights R. Co. (Sup.) 82 N. Y. Supp. 729; and many others which might be cited.   Where a person would not be chargeable with contributory negligence, as matter of law, if he had seen the car before attempting to cross in front of it, he cannot be so charged for a failure to see the car because he did not look.

The more serious question in the case arises on the appeal from the order denying the motion for a new trial on alleged newly discovered evidence. On the argument, I was inclined to the opinion that this motion should have been granted, but a careful study of the record has convinced me that the learned justice at Special Term was right in both points by which he was apparently influenced, viz., that the existence of the alleged new witness was known to the defendant before the trial, and that her evidence is not of sufficient value to warrant the belief that it could influence the result on a new trial. This witness is the woman who was in company with the deceased at the time of the occurrence, who then refused to give her name or address, but who now makes affidavit that she was driving the horse on the occasion in question; that she had no control of him; that the deceased knew she could not drive; that she and the deceased were talking and laughing, neither of them looking or thinking about the street car tracks; and that just before the car struck the wagon the deceased "seized the reins," but too late. Nothing which occurred upon the trial, and nothing which is presented in the motion papers, tends in the slightest degree to indicate that the accident occurred because of incompetent or unskillful driving. Assuming that the negligence of the woman, if she was driving, would be attributable, in law, to the deceased, there is no suggestion that she was negligent in any matter which contributed to the accident. The accident did not occur because the driver had lost control of the horse. All the witnesses on either side unite in the assertion that the horse was driven at a steady gait in the middle of the street and upon the tracks, without deviation, until the wagon was struck by the oncoming car, and under circumstances which render it of little consequence whether the car ran into a wagon driven by a man or by a woman. In other words, there is no pretense that the accident was occasioned, in whole or in part, by improper driving, or by a lack of control of the horse on the part of the driver.

The affidavit is at variance with all the evidence in the case. The accident not only occurred, as I have said, in the afternoon of a bright, clear day, but it was witnessed by a large number of people, both on the car and in the street, who had ample opportunity to observe everything connected with it; and it seems incredible that, if a woman had driven the deceased to his tragic death in their presence, the fact would have escaped the attention of every one of them. This is wholly apart from the question of unskillful handling of the reins, for, without any manifestation of that character, it would seem unlikely that the somewhat unusual circumstance of the woman driving would not have been noted by some one of the many who saw the wagon, its occupants, and the disaster. Fifteen eyewitnesses of the occurrence testified upon the trial, and all who testified on the subject asserted that the deceased was driving. Even the motorman, who had probably the best opportunity to observe, and who surely would have called attention to the fact that the woman was driving, especially if anything in the driving contributed to the accident, testified:

"I noticed a man coming down in a buggy, and driving kind of rapidly, and I sounded my bell and immediately applied the brakes, expecting this man to either turn to the right or to the left, and I see the man paid no attention. * * * I did not see this man look to the right and left, or make any effort to turn at all. He drove straight across."

The defendant knew the name and address of the woman long before the trial, but answered the case as ready and elected to go to trial without her evidence. She does not assert that she will testify upon a new trial, nor does the defendant assert that it desires or intends to call her as a witness. The evidence, such as it is, not being "newly discovered," in a legal sense, there being no suggestion that it would be used on a new trial, it being wholly in conflict with all the established facts, so that it is reasonably certain that it would not reverse the result, and it having no important bearing upon the question of liability if true, the motion was properly denied, under the well-settled principles of law applicable to the subject.

The verdict was large, but not excessive. The deceased was 38 years of age, and his income was the sole support of his wife, the plaintiff, and two children, aged 8 and 12 years, respectively. He held a life position as battalion chief in the fire department, at an annual salary of $3,300. While the verdict is a large one, I can only repeat the language of Judge Cullen in Thomas v. Union Railway Co., 18 App. Div. 185, 180, 45 N. Y. Supp. 920, which is even more applicable to-day than when it was written, viz.:

"The recovery in this case has been very large—much larger than we should have given him for the injury; but, compared with other recoveries which we have allowed to pass, we cannot say that it is so great as to justify our interference."

The judgment and orders should be affirmed.

BARTLETT and JENKS, JJ., concur.

WOODWARD, J. (dissenting). I agree with the contention of the defendant that the plaintiff has failed to show that her intestate was free from negligence contributing to the accident. The evidence is practically undisputed that the defendant was operating its car upon Fulton street at a high rate of speed, and that the plaintiff's intestate was driving a horse at the rate of five or six miles an hour—possibly more—along Hoffman Boulevard, headed directly for the defendant's line of railroad. It is urged as a ground of defendant's negligence that the motorman could have seen the plaintiff's intestate approaching the point of the accident at this pace a sufficient distance to have brought his car under control, and could thus have averted the accident, but it is not suggested by the evidence that the intestate could not have seen the car and the motorman an equal distance; and in view of the situation—that there was no continuation of the boulevard directly opposite—there is as good reason for assuming that the motorman did not anticipate the attempt to cross in front of him, as there was for the intestate to assume that the motorman would see him, and reduce the speed of his car sufficiently to avoid the accident. The case is barren of any evidence of care on the part of the intestate. He is shown to have been driving,

but no one saw him look to the right or left, or make any effort to check the speed of his horse, or do any act or thing from which it might be inferred that he was in the exercise of any degree of care whatever, except that one witness, apparently speaking of almost the exact instant of the accident, says: "The driver, before he was hit, was trying to stop the wagon—stop the horse. He was pulling to his right." The respondent, referring to this testimony, says in her brief: "The deceased was driving along the center of the boulevard with his horse, on an ordinary trot, five or six miles an hour, and continued straight across until he had gotten upon the track, and evidently saw the car almost on top of him, when he then tried to pull to the right to avoid it." That is, the deceased, between 3 and 4 o'clock in the afternoon of August 16, 1900—a man 38 years of age, in good health, and possessed of all his faculties—drove upon the tracks of the defendant, with a car approaching in full view; and there is no evidence whatever of any care on his part until his horse was upon the track, and he discovered the car upon him, "when he then tried to pull to the right to avoid it." This, aside from the testimony of one witness: "I saw the man in the buggy moving his lips. He was driving. He had the lines in his hand"—is the only evidence bearing upon the care exercised by the deceased to which our attention is called, and it seems wholly inadequate to support this judgment. It appears from the evidence that a woman was riding with the plaintiff's intestate, who disappeared, without giving her name, after the accident, and no witness is produced who is able to say that the intestate took any care whatever to avoid this accident. It seems to us quite proper that the jury should have found that the defendant was negligent in the operation of its car, but it is difficult to understand how it can be held that a man who drives upon the track, where a rapidly approaching car is in full sight for a distance of several hundred feet, at least, under the circumstances indicated by the evidence, can be said to be free from contributory negligence. The same argument which convicts the defendant's motorman of negligence would seem to be conclusive against the deceased. There is no suggestion that his horse was not entirely manageable, and could not have been stopped within a few feet, traveling at the rate of five or six miles an hour, or turned aside. Because the evidence does not show absence of contributory negligence which is a part of the plaintiff's affirmative case, I am of the opinion that the judgment and order appealed from should be reversed.

In support of the motion for a new trial on the ground of newly discovered evidence, it appears that Martha Louise Hinchey was with plaintiff's intestate at the time of the accident, and the defendant's investigators appear to have known of this fact, and to have reported to defendant, from time to time, either that they were unable to locate her, or that she claimed that the deceased was driving at the time of the accident. This young woman now says, in an affidavit, that plaintiff's intestate permitted her to drive; that she had no control over the horse—could not stop or turn him. She also says:

"Just before the car struck the buggy, Lane and deponent were talking and laughing, and neither of them looked; and deponent never even thought

of the car, or realized that they were approaching a street car track. That after the horse got to the track, and the car was just striking them, Lane seized the reins, but it was too late to avoid the accident then, as the car was right upon them. She had been driving with Lane at least five or six times before, and he knew that she was unable to control the horse," etc.

This, it seems to me, is important, as bearing upon the question of the plaintiff's intestate's contributory negligence; and the mere fact that the defendant knew of this witness, in view of the claim which she made, that the deceased was driving, does not rob this evidence of the character of newly discovered evidence. New trials are not granted upon newly discovered witnesses, but upon newly discovered evidence; and if the defendant had made proper inquiries, and had been assured that the witness would testify that the deceased was driving, it had a right to assume that she would be called by the plaintiff, or that her evidence was of no importance in defense. The evidence which this witness is prepared to give, as set forth in her affidavit, is certainly important, as bearing upon the leading issue in the case; and, after reading the affidavits of all of the parties, I find no suggestion that the defendant had any reason to believe that the witness would testify to the facts which she now states under oath, but, on the contrary, that it was expected, if she testified at all, that she would appear in support of the contention that the deceased was driving. The matters suggested by Miss Hinchey's affidavit, if true, show conclusively that the deceased was not exercising any degree of care, and, while the papers do not allege that this evidence will be offered upon a new trial, it is, I believe, the only rational inference to draw from the case as it is now presented. To say that the def:  dant will not offer this in evidence, which affirmatively shows negligence upon the part of the deceased, but will rely upon the case as formerly presented, is contrary to the interests of the latter, and business corporations may usually be depended upon to do that which it is for their interests to do.

The judgment and orders appealed from should be reversed, and defendant's motions, for a new trial granted.

GOODRICH, P. J.   I am constrained to dissent from the opinion of my associates, because I think that the judgment should be reversed on the ground that the verdict is excessive.  It was for $25,000, for which, with $2,140.66 interest, the judgment was entered.  The complaint alleged that the decedent was a "battalion chief in the fire department of the city of New York, earning $3,300 per annum," and left surviving him a widow and two children. Dale, the deputy chief of the fire department, testified that Lane had been connected with the department since 1885, had been promoted a number of times, and was chief of battalion, ranking as district engineer on the day of his death, at a salary of $3,300 per year; that the position was not an uncertain one, if he behaved himself; and that he was appointed for life, irremovable except for cause.

The widow testified:

"I was the wife of Charles W. D. Lane.  I am thirty-eight, and my husband at the time of his death was thirty-eight.  I had been married to him at the time of his death nearly 13 years.  I had two children—Ada Williams Lane—

at the time of the accident she was twelve years old; and my little boy was Charles Chandler Lane, eight years old at that time; and they are both living with me. My husband's health and physical condition before this accident was very fine. * * * His income was the sole support of me and my children."

There was also the testimony of a fireman that Lane's health before the accident was "first-class," and that he never, to his knowledge, had any other accident. This comprises the entire evidence relating to pecuniary loss.

Section 999 of the Code of Civil Procedure provides that the judge presiding at a trial by jury may entertain a motion "to set aside the verdict, * *, * or * * * grant a new trial upon exceptions; or because the verdict is for excessive or insufficient damages, or otherwise contrary to the evidence or contrary to law." The language indicates that a verdict for excessive damages is contrary to evidence. No distinction is made in the rank of the enumerated causes. They stand on the same plane. Excessive damages is just as potent a cause for reversal as a verdict contrary to evidence on other issues— no more, no less. It is stated in 14 Ency. Pl. & Pr. 756, where numerous authorities are cited, that the rule deducible from the authorities is that, in actions for personal injury, no mere difference of opinion as to the amount of damages will justify an interference by the court, unless the amount is so unreasonable and excessive as to be indicative of passion, prejudice, partiality, or corruption of the jury. The rule is more temperately stated in Graham's Practice, 633, where it is said that a new trial is seldom granted on this account unless the damages be outrageous (citing 2 Wm. Bl. 942, 1327), or the court be satisfied that the jury acted under the influence of undue motives, or of passion, error, or misconception. 6 T. R. 244. I think the true rule is that where it is clear from the evidence that the amount of a verdict indicates that it is against the evidence, or not supported by evidence, or not a just verdict, it may be set aside.

I am of opinion that the evidence was not sufficient to justify a verdict for $25,000, and that the judgment should be reversed for that reason.